**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| | ) | MDL No. 3192 |
| IN RE: COSTAR GROUP, INC., ET AL., ANTITRUST LITIGATION | ) | No. 3:26-md-03192 (DJN) |
| | ) | This document relates to ALL CASES |

**MEMORANDUM IN SUPPORT OF DEFENDANTS COSTAR GROUP, INC. AND COSTAR REALTY INFORMATION, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

A. CoStar Has Built Its CRE Platforms Through Years Of Investment ......................3
B. CoStar's Terms Do Not Impose Exclusivity On Brokers ......................................5
C. This Lawsuit........................................................................................................6

LEGAL STANDARD..............................................................................................7

ARGUMENT ..........................................................................................................7

I. PLAINTIFFS ALLEGE NO ANTICOMPETITIVE CONDUCT ....................................8

A. Plaintiffs Do Not Plausibly Allege Any Exclusivity (Counts 1-4) .........................8
B. There Is No Other Anticompetitive Conduct Alleged That Could Support A Section 2 Claim (Counts 5-8).............................................................15
1. The "Technological Measures" Are Not Exclusionary ............................15
2. CoStar's Litigation Conduct Is Immune Under *Noerr-Pennington*...........17
3. The Non-Compete Provisions Are Ancillary To A Legitimate License ...................................................................................19

II. PLAINTIFFS ALLEGE NO PLAUSIBLE MARKET OR MONOPOLY POWER ........20

A. Listing Services (Counts 1, 3, 5, and 7).............................................................21
B. Information Services (Counts 2, 4, 6, and 8) ......................................................22

III. PLAINTIFFS ALLEGE NO PLAUSIBLE ANTITRUST INJURY ................................24

IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED...........................................................25

CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ....................11

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)....................24

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....................24

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ....................19

*Balt. Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) ....................18

*BanxCorp v. Bankrate, Inc.*,
847 F. App'x 116 (3d Cir. 2021) ....................20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7, 13, 16, 21

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ....................15

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022) ....................12, 13

*Brill Maritime, Inc. v. Boats Group, LLC*,
2026 WL 1730090 (S.D. Fla. June 16, 2026) ....................10, 14, 21

*Chuck's Feed & Seed Co. v. Ralston Purina Co.*,
810 F.2d 1289 (4th Cir. 1987) ....................8, 12

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998)....................21

*Clorox Co. v. Sterling Winthrop, Inc.*,
117 F.3d 50 (2d Cir. 1997)....................12

*Colonial Penn Ins. Co. v. Coil*,
887 F.2d 1236 (4th Cir. 1989) ....................19

*Compass, Inc. v. Zillow, Inc.*,
2026 WL 321084 (S.D.N.Y. Feb. 6, 2026)....22

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025)....11, 12

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
2023 WL 2468742 (C.D. Cal. Feb. 23, 2023), *rev'd on other grounds*, 150 F.4th 1056 (9th Cir. 2025)....16

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
2025 WL 2647269 (C.D. Cal. June 25, 2025)....1, 19

*CoStar Grp., Inc. v. LoopNet, Inc.*,
164 F. Supp. 2d 688 (D. Md. 2001)....18

*CoStar Grp., Inc. v. Xceligent, Inc.*,
2019 WL 6622862 (W.D. Mo. Dec. 3, 2019)....19

*CSX Transp., Inc. v. Norfolk S. Ry. Co.*,
114 F.4th 280 (4th Cir. 2024)....25

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002)....8, 13, 20

*Eastman v. Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015)....24

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016)....12

*Francis v. Giacomelli*,
588 F.3d 186 (4th Cir. 2009)....7

*Gamboa v. Apple Inc.*,
808 F. Supp. 3d 951 (N.D. Cal. 2025)....23

*Glob. Tel*Link Corp. v. JACS Sols. Inc.*,
708 F. Supp. 3d 784 (E.D. Va. 2023)....12, 14

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005)....21, 23

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
733 F. App'x 380 (9th Cir. 2018)....12

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
335 F.3d 303 (4th Cir. 2003)....17

*In re Birmingham*,
846 F.3d 88 (4th Cir. 2017) ....................7

*In re Zetia (Ezetimibe) Antitrust Litig.*,
400 F. Supp. 3d 418 (E.D. Va. 2019) ....................2

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ....................20

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ....................23

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)....................12, 23

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) ....................20, 22

*L.A. Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993) ....................23

*Lancianese v. Bank of Mount Hope*,
783 F.2d 467 (4th Cir. 1986) ....................25

*McElhenney Co. v. W. Auto Supply Co.*,
269 F.2d 332 (4th Cir. 1959) ....................10

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008)....................20

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013)....................12

*Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*,
123 F. Supp. 2d 945 (W.D.N.C. 2000) ....................24

*Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
878 F. Supp. 804 (D. Md. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996) ....................19

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ....................19

*Nahigian v. Juno Loudoun, LLC*,
684 F. Supp. 2d 731 (E.D. Va. 2010) ....................9

*Navient Sols., LLC v. Lohman*,
136 F.4th 518 (4th Cir. 2025) ....................18

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ....................................................................................9

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)....................................................................................................8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)...........................................................................................15, 16

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) .......................................................................................2

*PNY Techs., Inc. v. SanDisk Corp.*,
2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............................................................10

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985) .....................................................................................19

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd sub nom.* 67 F. App'x 810 (4th Cir. 2003) ...........................................................................................................21

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ................................................................................20, 24

*R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*,
67 F. App'x 810 (4th Cir. 2003) ..................................................................................13

*Sambreel Holdings LLC v. Facebook, Inc.*,
906 F. Supp. 2d 1070 (S.D. Cal. 2012).......................................................................16

*Scaturo v. Fanatics, Inc.*,
2026 WL 810372 (S.D.N.Y. Mar. 23, 2026) ...............................................................24

*Serv. & Training, Inc. v. Data Gen. Corp.*,
963 F.2d 680 (4th Cir. 1992) .......................................................................................9

*Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*,
711 F.3d 1264 (11th Cir. 2013) ..................................................................................20

*Tampa Elec. Co. v. Nash. Coal Co.*,
365 U.S. 320 (1961)....................................................................................................8

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998).........................................................................................22

*United Air Lines, Inc. v. Austin Travel Corp.*,
867 F.2d 737 (2d Cir. 1989)...................................................................................11, 12

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) ....................................................................................19

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)......................................................................................................8

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko. LLP*,
540 U.S. 398 (2004)..........................................................................................2, 16, 17

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ..........................11

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)..........................................................................................11

**STATUTES**

15 U.S.C. § 15b...........................................................................................................25

**OTHER AUTHORITIES**

*The Future of Commercial Real Estate: Why Digital Marketplaces Are Here to Stay* (Nov. 19, 2025), https://www.prnewswire.com/news-releases/the-future-of-commercial-real-estate-why-digital-marketplaces-are-here-to-stay-302619708.html ............................................................................................14

## INTRODUCTION

The Corrected Consolidated and Amended Class Action Complaint ("Complaint") is a cut-and-paste job that tries to turn a competitor's stale antitrust allegations into a putative customer class action. Plaintiffs' allegations are lifted wholesale from counterclaims that CoStar's competitor, Commercial Real Estate Exchange, Inc. ("CREXi"), first asserted in 2021—a year into CoStar's copyright suit against CREXi, and only after the district court allowed CoStar's copyright infringement claims to proceed. Countercls., *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 2:20-cv-08819-CBM-AS (C.D. Cal. June 23, 2021), ECF No. 74. Those counterclaims were simply a bid for leverage in litigation that has gone CoStar's way: the California court has since found that CREXi had an "established practice or policy" of infringing CoStar's copyrighted images and CoStar's claims for industrial-scale infringement head to trial in April 2027. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2025 WL 2647269, at *13 (C.D. Cal. June 25, 2025).

Plaintiffs here, suing more than five years later, adopt CREXi's allegations wholesale—down to its dated anecdotes about anonymous brokers. But the transplant does not take. Allegations about a rival's exclusion do not alone establish a customer's overcharge. And a borrowed competitor's complaint does not supply what the antitrust laws demand of these Plaintiffs: facts about their own dealings with CoStar, including what they paid, why those prices are "supracompetitive," and how they were barred from working with CoStar's competitors.

Five named Plaintiffs, seven law firms, and 116 pages later, the Complaint still does not identify a single instance in which any broker, much less a named Plaintiff, was locked into using CoStar's platform during the alleged Class Period (*i.e.*, April 14, 2022 to the present). No named Plaintiff alleges that CoStar prevented it from cross-listing any commercial real estate ("CRE") listing on a rival platform, sued or threatened to sue it for cross-listing, watermarked its

photographs, altered its listing data, or blocked access to its listings. To the contrary, the very CREXi pleadings Plaintiffs borrow from confirm that brokers can and *do* cross-list their CRE properties. And while Plaintiffs allege that the challenged Customer Terms remain in effect, they identify no Class Period instance in which those Terms barred any broker from dealing with a rival. That gap is fatal to Plaintiffs' entire theory—and it is only the first of several.

*First*, the Complaint pleads no exclusionary conduct. The supposed "scheme" rests on one premise: that CoStar locks brokers into its platform and starves rivals of the listings they need to compete. Plaintiffs' own allegations refute it. The Customer Terms grant CoStar only a "non-exclusive" license and confirm that brokers "retain[] any applicable ownership rights" in their content. Ex. A § 10(b); Ex. B § 11; Ex. C § 8(b); Ex. D § 10.[1] Brokers may give rivals their own photographs and materials directly—and they do. What rivals cannot do is mass-copy CoStar's database to compete against it. That is Plaintiffs' real grievance. Stripped of rhetoric, the Complaint asks this Court to pry open CoStar's proprietary platforms so rivals can free ride on CoStar's investment, take its content, and republish it as their own. The Sherman Act imposes no such duty. *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko. LLP*, 540 U.S. 398, 407, 411 (2004). Nor do Plaintiffs plead substantial foreclosure. They describe the opposite: a rival, CREXi, that entered at "half the price or less," undercuts CoStar, and is now its "chief competitor." That is not a foreclosed market.

[1] These exhibits are documents that the Complaint cites and relies upon as support for several of its factual allegations. *See* Compl. ¶¶ 11 & n.1, 13-14, 96-98, 101, 104-15, 117, 125-26, 128-29, 151. The exhibits are therefore incorporated by reference and should be considered in resolving this motion. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (court may consider documents integral to, and explicitly relied on in, complaint); *In re Zetia (Ezetimibe) Antitrust Litig*., 400 F. Supp. 3d 418, 427 (E.D. Va. 2019) (considering agreement attached to motion to dismiss).

*Second*, the Complaint pleads no market or monopoly power. Plaintiffs call CoStar's prices "supracompetitive," but never identify a competitive benchmark or account for quality. Nearly every cited price increase predates the Class Period, and many came as CoStar offered *more*—like nationwide coverage in place of regional subscriptions. And their market-share figures rest on web "activity"—a meaningless measure when brokers list the same property on multiple platforms.

*Third*, Plaintiffs plead no antitrust injury. Each alleges that it paid "supracompetitive fees," but none says what it bought, what it paid, or how the exclusion of any rival inflated its price. And no Plaintiff says it tried to switch to the cheaper rivals the Complaint itself describes but could not.

*Finally*, Plaintiffs' claims are untimely. Every challenged practice allegedly began years ago. Plaintiffs identify no new anticompetitive act within the limitations period. And no tolling theory can rescue their stale claims from the Sherman Act's four-year statute of limitations.

The Complaint should be dismissed with prejudice.

## BACKGROUND

### A. CoStar Has Built Its CRE Platforms Through Years Of Investment

Since its founding in 1987, CoStar has spent nearly four decades becoming a leading provider of CRE information, analytics, and online marketplaces. Compl. ¶¶ 2-3, 53. Over that time, CoStar has invested billions of dollars and employed thousands of researchers and other employees to build a comprehensive suite of CRE platforms that the Complaint concedes are "widely regarded as essential" to brokers. *Id.* ¶ 220.

Today, CoStar offers two primary CRE products. The first is LoopNet—an online marketplace where brokers and property owners can advertise CRE properties for sale or lease, and prospective buyers or tenants can search for them. *Id.* ¶ 3. As an add-on to LoopNet, CoStar offers a service called "LoopLink," which "lets brokers embed LoopNet-managed listings directly

onto their own websites," so "the listings appear to visitors as part of the broker's own site." *Id.* ¶ 67. The content displayed on a broker's website through LoopLink is hosted by LoopNet. *Id.*

The second product is the CoStar-branded subscription database (the "CoStar Database"), which provides data and analytics on CRE properties—historical sales or lease prices, comparable properties, property histories, photographs, vacancy rates, and more. *Id.* ¶ 184; *see id.* ¶ 49. That information comes from many sources: "public records," third-party data vendors, CRE brokers, and others, *id.* ¶ 51—as well as from CoStar itself, whose own photographers and researchers generate content for its platforms, *id.* ¶¶ 87, 164, 176, 178. CoStar's value lies in researching, generating, aggregating, and analyzing that dispersed information—including through the "analytics" and "analytical tools" it offers subscribers—sparing brokers and investors the costly and impracticable burden of doing so themselves. *Id.* ¶¶ 49, 185, 222.

Building a successful CRE platform is "difficult, costly, and time-consuming." *Id.* ¶ 204 (citation omitted). Much of CoStar's investment has gone into the painstaking work of gathering CRE information property by property. As the Complaint itself recounts, CoStar researchers obtain "the most complete and up-to-date information about commercial real estate in a variety of ways"—including by "asking the broker a series of questions about the property," and by collecting listings that brokers themselves direct CoStar to take from their websites or email to CoStar. *Id.* ¶ 164. Further, CoStar's own photographers photograph properties, *id.* ¶¶ 87, 176, 178; its researchers regularly contact brokers to gather and update listing information, *id.* ¶¶ 62, 267; and CoStar compiles that information into "analytics," "market reports," and "sales and lease comps" that subscribers "cannot easily" replicate, *id.* ¶¶ 185, 191, 222. Other investments came through strategic acquisitions that expanded CoStar's capabilities, expanded the content of its database, and improved its products. In 2012—more than 14 years ago—CoStar acquired LoopNet

for $860 million, combining LoopNet's then industry-leading CRE marketplace with CoStar's data analytics service to create a single, integrated platform. *Id.* ¶¶ 9, 33, 69, 191.

**B. CoStar's Terms Do Not Impose Exclusivity On Brokers**

To protect its substantial investment in its CRE products, CoStar has adopted carefully balanced terms of use (the "Customer Terms"). On one hand, a broker that uploads its own images or data to CoStar's platforms retains all rights to them, and CoStar receives only a "*non-exclusive*" right. Compl. ¶¶ 108, 117; Ex. A § 10(b); Ex. B § 11; Ex. C § 8(b); Ex. D § 10 (emphasis added).

On the other hand, not least because of the huge investment that CoStar makes to research, generate, analyze, and serve content beyond broker uploads, the Customer Terms prohibit customers from taking information directly from LoopNet or the CoStar Database and handing it to CoStar's competitors. Compl. ¶¶ 109-12. LoopNet's terms, for example, prohibit "us[ing] or reproduc[ing] . . . any portion of the Product"—*i.e.*, the "Website, Listings, Company Information, the Interface, the LoopLink Service, and all other information and content contained in or provided through the Website, including . . . the proprietary organization, layout, design and structures for categorizing, sorting, and displaying it, . . . and the related tools and software"—"in connection with any other listing service, device or data sharing arrangement." Ex. A §§ 1, 4(b)(iv). And they require users to treat "the Product" as "proprietary" to LoopNet. Ex. A § 14; Ex. B § 12. The terms for LoopLink and the CoStar Database contain similar rules. Ex. D §§ 4(b), 11; Ex. B § 3(b).

Together, the Customer Terms let CoStar's customers do whatever they want with their own original listing materials; what they cannot do is copy CoStar's Product—including the CoStar photographs, data, and descriptions that often populate their listings—and hand it to competitors. And brokers have every reason to share their own content widely without involving CoStar. Because they "make money when their properties are sold or leased, they are naturally eager to obtain the maximum possible exposure for their listings." Compl. ¶ 164. Brokers thus

can and do regularly cross-list their CRE properties on multiple marketplaces and information services. *Id.* ¶ 149 (customer-owned photographs "appeared on CREXi's database"); *id.* ¶ 87 (brokers "protested" when CREXi removed photographs from their CREXi listings); *infra* 11.

**C. This Lawsuit**

In April 2026, Shapiro Hospitalities LLC d/b/a Grand & Co., a Brooklyn-based commercial real estate brokerage, filed the first of these putative class actions in this District. *Shapiro Hosps. LLC v. CoStar Grp., Inc.*, No. 1:26-cv-01027 (E.D. Va. filed Apr. 14, 2026); Compl. ¶¶ 23, 47. Other CRE brokers filed similar suits elsewhere, and the Judicial Panel on Multidistrict Litigation centralized the actions before this Court. *See In re CoStar Grp., Inc., Antitrust Litig.*, MDL No. 3192 (J.P.M.L. 2026), ECF Nos. 34, 38. After the Court appointed interim co-lead class counsel, ECF No. 11, Plaintiffs filed the operative Complaint on October 2, 2026, ECF No. 31.

Plaintiffs are five CRE brokerages—Grand & Co., Malm, Legacy, ONE Street, and Lamm Properties—based in New York, California, Oregon, Maryland, and Florida. Compl. ¶¶ 23-27, 47. They seek to represent a nationwide class of customers who "paid Defendants for use of the CoStar Database or LoopNet" from April 14, 2022 to the present. *Id.* ¶ 272. Their theory is that CoStar maintains its dominance in two markets—CRE listing and information services—through a six-part "scheme" to "lock[] up CRE Listing Data" such that it appears exclusively on CoStar's platforms. *Id.* ¶¶ 10, 103. Three parts of the "scheme" are based on CoStar's terms: contractual provisions that allegedly bar customers from sharing listing data with rivals, intellectual-property provisions that allegedly claim ownership of that data, and non-compete provisions. *Id.* ¶ 103. The other three components allegedly enforce those terms: watermarking and "fingerprinting" to monitor compliance, technological barriers that block competitors from viewing listings on LoopNet and LoopLink-powered websites, and "serial litigation" against rivals and customers. *Id.*; *see id.* ¶ 330. Plaintiffs challenge the Customer Terms as exclusive dealing under Sections 1

and 2 of the Sherman Act (Counts 1-4), and the purported six-part "scheme" as monopolization and attempted monopolization under Section 2 (Counts 5-8).

The only Plaintiff-specific factual allegation is that each Plaintiff allegedly paid CoStar fees for its CRE listing service or for both its listing and information services. *Id.* ¶¶ 23-27. But the Complaint does not say which CoStar products Plaintiffs buy, how long they have subscribed, or what they pay. Nor does any Plaintiff allege that it, or any other brokerage, lists properties only on CoStar or LoopNet. And none alleges that it, or any other brokerage, has ever been unable to list any property on any competing platform—let alone because of anything CoStar did.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard requires a plaintiff to demonstrate "more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). It requires the plaintiff to articulate facts that, when accepted as true, "show" that the plaintiff has stated a claim entitling him to relief. *Id.* "Accordingly, a complaint is insufficient if it relies upon 'naked assertions' and 'unadorned conclusory allegations' devoid of 'factual enhancement.'" *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). A motion to dismiss is assessed based on "the complaint," "documents incorporated into the complaint by reference," and "matters properly subject to judicial notice." *Id.*

## ARGUMENT

Plaintiffs' claims should be dismissed for at least four independent reasons. *First*, the Complaint alleges no anticompetitive conduct. *Second*, Plaintiffs fail to plead market power, much

less monopoly power. *Third*, Plaintiffs fail to plead antitrust injury. And *fourth*, Plaintiffs' claims are time-barred. Each defect independently requires dismissal.

## I. PLAINTIFFS ALLEGE NO ANTICOMPETITIVE CONDUCT

Every one of Plaintiffs' claims requires anticompetitive conduct. Section 1 requires a restraint with a "substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002). Section 2 requires the "willful acquisition or maintenance" of monopoly power, as distinguished from growth "as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The Complaint pleads neither.

### A. Plaintiffs Do Not Plausibly Allege Any Exclusivity (Counts 1-4)

Counts 1-4 allege that CoStar's Customer Terms are "exclusive agreements" that "restrain customers' ability to share their own CRE Listing Data with CoStar competitors." Compl. ¶¶ 308, 318; *see id.* ¶¶ 11, 117, 298. But an exclusive-dealing claim requires both (1) an agreement to deal exclusively, and (2) foreclosure of competition in a substantial share of the relevant market. *Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 327-29 (1961); *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1295 (4th Cir. 1987). Plaintiffs plead neither element.

#### 1. CoStar's Customer Terms Are Not Exclusive

The Customer Terms do not require exclusivity; they disclaim it. As Plaintiffs concede, the Terms grant CoStar only a "*non-exclusive* license" to customer-submitted content, Compl. ¶¶ 101, 108 (emphasis added), and expressly preserve brokers' "rights to" and "ownership" of their own information and photographs, *id.* ¶ 117; Ex. D § 10; *supra* 5. That ends the inquiry: Where "a term of the [a]greement directly contradict[s] an allegation in the [complaint] regarding that

term, the plain language of the contract . . . prevail[s]." *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 739 (E.D. Va. 2010).

Plaintiffs seize on a provision restricting redistribution of CoStar's "Product." Compl. ¶¶ 109-12, 115. But "Product" is not synonymous with a broker's own listings; it is a defined term that encompasses only the licensed portions of CoStar's "Database, Information, Analysis, and Reports," including the "proprietary organization, layout, design and structures" and related tools and software. Ex. D § 1; Ex. B § 1. The restriction thus bars brokers from taking content from CoStar's Product, which includes content they do not own and have never owned, *supra* 5, and redistributing it to CoStar's competitors. It does not prevent any broker from giving competitors its *own* original CRE materials directly. Reading it otherwise would nullify the very ownership and non-exclusivity provisions Plaintiffs concede. *Supra* 8.

Indeed, Plaintiffs' own premise defeats their theory. Plaintiffs insist that brokers own their own original listing materials and decide where to send them. Compl. ¶¶ 116, 125, 164. But ownership cuts both ways. On a nationwide platform aggregating materials from thousands of brokers, any one broker owns only a fraction of specific content; the rest belongs to other brokers and CoStar itself. Plaintiffs would turn a broker's right to share its own original materials directly into a right to copy everyone else's. Preventing *that* is what the Terms do. And protecting an information database from copying is not exclusive dealing—if it were, every database and software license in America restricting redistribution would be a potential antitrust violation. *See, e.g.*, *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 685-87 (4th Cir. 1992) (business may lawfully license product to whomever it chooses); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (no duty to share intellectual property with rivals).

A recent decision rejected a similar attempt to recast platform restrictions as exclusive dealing. In *Brill Maritime, Inc. v. Boats Group, LLC*, a boat brokerage alleged that a dominant listing platform's terms effectively barred brokers from listing with rivals. 2026 WL 1730090, at *10 (S.D. Fla. June 16, 2026). The court dismissed the claim because the terms restricted how brokers could use listings on defendant's platform—not whether they could list the same inventory elsewhere. *Id.* As the court put it, "[t]he Terms simply don't say what [the plaintiff] claims they say." *Id.* So too here: The Customer Terms restrict copying CoStar's Product, not cross-listing on competing platforms. Plaintiffs cannot transform one into the other by labeling it exclusive dealing. *E.g.*, *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *4-7 (N.D. Cal. Apr. 25, 2014) (dismissing where plaintiff failed to explain how retailers were compelled to deal exclusively).

Nor can Plaintiffs manufacture exclusivity from the copyright acknowledgment, no-challenge clause, or assignment of enforcement rights. Compl. ¶¶ 113-14, 125-26. The first two protect CoStar's rights in its "Licensed Product"—not brokers' independently owned photographs or listings, which they remain free to send to any rival directly. *See* Ex. D §§ 10-11; Ex. B §§ 11-12. And the enforcement provision reaches only third parties that have, "without authorization," "scraped, copied, or distributed" a broker's content "and for which [the broker] ha[s] not granted such third parties a separate license to use." Ex. C § 12; Ex. A § 14. Thus, far from prohibiting brokers from dealing with competitors, the Customer Terms expressly contemplate their right to do so.

Unable to find *express* exclusivity, Plaintiffs fall back on "de facto" exclusivity. Compl. ¶ 118. The Fourth Circuit has never recognized that theory; it requires an actual "condition, agreement or understanding of exclusivity," express or inferred. *McElhenney Co. v. W. Auto*

*Supply Co.*, 269 F.2d 332, 337-38 (4th Cir. 1959); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 152-53 (4th Cir. 1990). But other courts that do recognize it demand features that compel exclusivity, like market-share targets backed by financial penalties. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282-83 (3d Cir. 2012). Plaintiffs identify none. Ordinary one- to three-year subscriptions, Compl. ¶¶ 226, 262, do not qualify. *E.g.*, *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064-65 (N.D. Cal. 1998) (three-year term not exclusive), *aff'd*, 190 F.3d 974 (9th Cir. 1999). Nor can a handful of anonymous, pre-Class Period anecdotes—out of hundreds of thousands of customers—turn an expressly non-exclusive contract into an exclusive one. Compl. ¶¶ 119-20; *see United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir. 1989) (rejecting de facto exclusivity based on travel agents' reluctance to use competing systems that contracts expressly permitted).

And, fatally, while waving at the de facto doctrine, the Complaint fails to allege that exclusivity existed in fact. The Complaint does not allege that any named Plaintiff—or any other identified brokerage—was unable to list on CREXi or any other competing platform, declined to do so, or was prevented from doing so, during the Class Period. Quite the opposite: Plaintiffs allege that CoStar "oftentimes takes listing photographs directly off of the CREXi website at the broker's behest." Compl. ¶ 165; *id.* ¶ 87 (brokers "protested" when CREXi removed photographs from their CREXi listings); *id.* ¶ 149 (customer-owned photographs "appeared on CREXi's database"). And documents incorporated by reference into the Complaint confirm that brokers can and *do* cross-list. *See, e.g.*, Countercls. at 34, ECF No. 74 ("brokers frequently share links to their listings with competing CRE platforms, expecting them to post the same listing").[2]

---

[2] Plaintiffs rely on the Ninth Circuit's decision in *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025), but that decision is not binding, and the Court should not follow it. *CREXi* rested on a de facto exclusivity theory the Fourth Circuit has not adopted. 150 F.4th at

A contract that leaves brokers free to list wherever they choose—and under which brokers in fact regularly cross-list—is not an exclusive agreement. *See United Air Lines*, 867 F.2d at 742. Counts 1-4 fail at the first element.

### 2. In Any Event, Plaintiffs Have Not Pled Substantial Foreclosure

Even if the Customer Terms could be recast as exclusive, Plaintiffs' claims would still fail for lack of substantial foreclosure. Exclusive dealing is unlawful only when "a significant fraction of buyers or sellers are frozen out of a market." *Glob. Tel*Link Corp. v. JACS Sols. Inc.*, 708 F. Supp. 3d 784, 797 (E.D. Va. 2023) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring)). Conclusory foreclosure allegations do not suffice. *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530-31 (5th Cir. 2022); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018).

Plaintiffs offer little more than conclusions. The Complaint does not identify a single broker, among the hundreds of thousands nationwide, who was locked into using CoStar exclusively during the Class Period. Nor does reluctance to use a rival establish an inability to do so: Even if the Customer Terms made cross-listing marginally less convenient, "[t]he antitrust laws do not guarantee competitors the right to compete free of encumbrances." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 564 (D. Md. 2013) (quoting *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 59 (2d Cir. 1997) (dismissing challenge to rules that allegedly made third-party access to listing data more difficult)); *e.g.*, *Eisai, Inc. v. Sanofi*

---

1073. Its only evidence of exclusivity was anecdotes from three brokers who (incorrectly) believed they could not work with CREXi. *Id.* at 1074. But reluctant customers cannot convert an expressly non-exclusive contract into an exclusive one. *United Air Lines*, 867 F.2d at 742. The court then effectively dispensed with substantial foreclosure, treating monopoly power as sufficient. *CREXi*, 150 F.4th at 1067. But Fourth Circuit law permits no such shortcut. *Infra* 13; *e.g.*, *Chuck's Feed*, 810 F.2d at 1295. And even the Ninth Circuit recognized that "properties can be listed on multiple sites." *CREXi*, 150 F.4th at 1070.

*Aventis U.S., LLC*, 821 F.3d 394, 403, 406-08 (3d Cir. 2016) (rejecting de facto exclusive-dealing theory despite customer hesitation to switch). The Complaint's only foreclosure figure—that the alleged "scheme" "likely result[s] in a foreclosure share greater than 90%," Compl. ¶ 123—is simply CoStar's alleged market share, restated, *id.* ¶¶ 227, 290, 301, 311, 321 (foreclosure is substantial "because" the agreements "cover the market" in which CoStar "holds monopoly power"). That figure is itself unreliable, for reasons explained below. *See infra* 22-24. More fundamentally, the Fourth Circuit has never held that a defendant's market share alone establishes substantial foreclosure. *See, e.g.*, *Dickson*, 309 F.3d at 207 n.17, 209-10 (affirming dismissal where allegations of Microsoft's monopoly power did not establish that the challenged licensing agreements could substantially impair competition); *R.J. Reynolds Tobacco Co. v. Philip Morris USA, Inc.*, 67 F. App'x 810, 812 (4th Cir. 2003) (assuming market power but affirming summary judgment because plaintiffs failed to establish substantial foreclosure). Plaintiffs must plead facts showing that rivals were actually frozen out of each market. *See BRFHH*, 49 F.4th at 529-31 (affirming dismissal for failure to plausibly allege substantial foreclosure notwithstanding the defendant's uncontested monopoly power). They have not done so for either one.

***CRE Listing Services Market (Counts 1, 3).*** The Complaint pleads no foreclosure for listings during the Class Period, which begins April 14, 2022. Compl. ¶ 272. Every purported example of a broker being restrained from cross-listing either predates that date or is undated, and most are cut and pasted from CREXi's four-plus-year-old counterclaims. *Id.* ¶¶ 93, 120-21, 131-35, 146, 223. The only bridge into the Class Period is a single conclusory sentence that the alleged "scheme" "has remained in full effect throughout the Class Period and continues to the present." *Id.* ¶ 269. But that is a legal conclusion, not a fact. *Twombly*, 550 U.S. at 555-57. That the Customer Terms remained in place establishes nothing without some instance in which they

stopped a broker from cross-listing—and the Complaint identifies none. *See Brill Maritime*, 2026 WL 1730090, at *10 (dismissing where complaint did not "produce any *facts* to support [its] conclusory claim" that terms made "multi-homing or platform-switching . . . impractical or outright impossible").

The facts Plaintiffs do plead confirm competitors were *not* foreclosed. CREXi entered in 2015 at "half the price or less" than CoStar, Compl. ¶ 84; it still charges "less than half," *id.* ¶ 215; and it is one of the "fastest growing CRE marketplace[s]," *id.* ¶ 85.[3] A market in which a lower-priced rival has entered and swiftly grown, and in which output *rose*, *id.* ¶ 190, is not one in which competitors were "'frozen out.'" *Glob. Tel*Link*, 708 F. Supp. 3d at 797.

***Information Services Market (Counts 2, 4).*** The information services allegations are even thinner. The Complaint does not allege that any named Plaintiff or identified broker was prevented from using a competing CRE information service during the Class Period, or that any competitor could not obtain the CRE data it needed to compete. The only efforts to even discuss building a competing database that Plaintiffs identify—the 2011 consortium of CBRE, JLL, and Cushman & Wakefield and the 2021 AIR CRE meeting—predate the Class Period. Compl. ¶¶ 131-34. Regardless, by Plaintiffs' own account, neither effort failed because any contractual term barred it; those parties abandoned their efforts because they were "nervous" and feared "retaliation." *Id.* Meanwhile, competitors that did enter successfully—including CREXi, which offers information services—show the opposite of foreclosure. *Id.* ¶¶ 84, 196.

---

[3] CREXi similarly describes itself as the dominant player in both the listing and information services markets: It holds itself out as "the nation's leading commercial real estate marketplace and data platform." Press Release, CREXi, *The Future of Commercial Real Estate: Why Digital Marketplaces Are Here to Stay* (Nov. 19, 2025), https://www.prnewswire.com/news-releases/the-future-of-commercial-real-estate-why-digital-marketplaces-are-here-to-stay-302619708.html.

Lacking any factual allegations of foreclosure, Plaintiffs fall back on price and retention. They allege that CoStar has maintained its global subscription "throughout the Class Period," raised prices annually from 2022 through 2025, and retained most of its customers. *Id.* ¶¶ 260-61, 264. But those allegations simply describe what CoStar charged and how many customers chose to renew, not whether any competitor was unable to compete. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012) (affirming dismissal where mandatory packages increased prices and reduced consumer choice but did not foreclose competing offerings).

### B. There Is No Other Anticompetitive Conduct Alleged That Could Support A Section 2 Claim (Counts 5-8)

Counts 5-8 allege a six-part "scheme" involving the Customer Terms, the IP provisions, the non-competes, watermarking and fingerprinting, technological blocking, and litigation. Compl. ¶¶ 103, 330, 343, 356, 371. But the parts are not equals. Plaintiffs call the Customer Terms "the linchpin of the alleged Scheme," *id.* ¶ 12, and plead everything else as a means of enforcing them, *see id.* ¶¶ 136, 156, 182. But because the Customer Terms neither require exclusive dealing nor substantially foreclose competition, *supra* 8-15, the premise of the entire scheme fails. In any event, none of the remaining practices plausibly constitutes exclusionary conduct. Plaintiffs cannot change that by invoking the scheme's "cumulative and synergistic effect," Compl. ¶¶ 331, 344, 357, 372, because aggregating lawful conduct does not produce unlawful conduct, *see Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).

#### 1. The "Technological Measures" Are Not Exclusionary

Plaintiffs plead each of the "technological measures"—blocking, watermarking, and fingerprinting—not as an independent restraint, but as a means "to monitor and enforce compliance with" the Customer Terms. Compl. ¶¶ 136, 150, 156. But none of these measures stops a broker from giving a rival its own listings, or a rival from collecting listings from brokers.

Blocking controls only who may access CoStar's own platforms, and watermarking and fingerprinting only "identify" copying from those platforms after the fact, *id.* ¶ 15. Plaintiffs' answer is to call these measures "one aspect of a broader set" of conduct. *Id.* ¶ 155. But a label is not a fact, and it cannot make an exclusionary inference plausible. *See Twombly*, 550 U.S. at 567.

***Blocking.*** Plaintiffs allege that CoStar blocks competitors from accessing public LoopNet pages and brokers' LoopLink-powered websites without notifying brokers. Compl. ¶¶ 157-60. But LoopNet is CoStar's website, and LoopLink (which "Link[s]" to "LoopNet") is *CoStar's own hosted service*. Blocking a rival from accessing CoStar's platforms is not the same as preventing brokers from supplying their own listing information to that rival. As Judge Marshall explained in addressing these same practices, brokers remain free to use CREXi and provide identical information to both platforms. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 2023 WL 2468742, at *2-3 (C.D. Cal. Feb. 23, 2023), *rev'd on other grounds*, 150 F.4th 1056 (9th Cir. 2025). Nor does a rival's preference for obtaining that information through CoStar's platforms create an obligation to provide it. *See Trinko*, 540 U.S. at 410 ("[I]nsufficient assistance in the provision of service to rivals is not a recognized antitrust claim"); *linkLine*, 555 U.S. at 448. Courts have specifically rejected antitrust claims premised on a platform's refusal to permit competitor access. *E.g.*, *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075 (S.D. Cal. 2012).

***Watermarking.*** CoStar's purported watermarking practices likewise do not prevent brokers from dealing with competitors. Compl. ¶¶ 136-49. As Judge Marshall explained, brokers retain ownership of their original photographs and remain free to provide them to any competitor. *CoStar*, 2023 WL 2468742, at *3. What a watermark impedes is a rival lifting photographs off CoStar's site—including photographs taken by CoStar's own photographers, Compl. ¶ 87. That is precisely the purpose Plaintiffs' own allegations describe: "to ensure others don't scrape our

data and use photos from our site on other sites." *Id.* ¶ 146. But the antitrust laws do not require that CoStar make its platforms easier for rivals to copy. *See Trinko*, 540 U.S. at 410; *supra* 9.[4]

***Fingerprinting.*** Plaintiffs fare no better with CoStar's alleged use of "seed" data to detect whether its content has been copied into rival databases. Compl. ¶¶ 15, 150-55. They identify no Class Period instance in which CoStar used the practice, enforced anything based on it, or deterred any broker from using a rival. Nor does any Plaintiff allege that CoStar altered its listings or impeded it from supplying them to a competitor.[5] On Plaintiffs' own theory, seeded data matters only when a broker "pull[s]" a listing *from CoStar's platforms* and hands that copy to a rival. *Id.* ¶ 153. And their claim that seeding "degraded the quality of" CoStar's database, *id.* ¶ 154, defeats itself: A firm that degrades its own product makes rivals *more* competitive, not less.

### 2. CoStar's Litigation Conduct Is Immune Under *Noerr-Pennington*

The *Noerr-Pennington* doctrine immunizes petitioning activity, including lawsuits and pre-suit demand letters, from antitrust liability. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). That protection covers each litigation-related act the Complaint

---

[4] To be clear, CoStar's policy is *not* to watermark broker-owned photographs; its software applies CoStar's distinctive "Star" watermark only to photographs CoStar owns. The Complaint offers no example to the contrary. It reproduces a handful of images bearing the word "CoStar," all predating the Class Period. Unsurprisingly, no Plaintiff identifies any instance in which CoStar watermarked Plaintiffs' own photographs.

[5] The "seeding" allegations appear to come from CoStar's 2016 suit against Xceligent, which involved no seeding at all. CoStar caught Xceligent's mass copying through naturally occurring data discrepancies, and an FTC monitor later found that Xceligent had improperly copied tens of thousands of CoStar's copyrighted photographs. *See* Joint Factual Stipulation at 3, *CoStar Grp., Inc. v. Xceligent, Inc.*, No. 4:16-cv-01288-FJG (W.D. Mo. Dec. 2, 2019), ECF No. 202; *see also CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 2:20-cv-08819-CBM-AS (C.D. Cal. Feb. 18, 2022), ECF No. 111 ("CREXI's claim that CoStar's lawsuit against Xceligent . . . is indicative of CoStar's anticompetitive and unlawful conduct . . . is meritless . . . [D]uring the pendency of its lawsuit against Xceligent, an independent monitor appointed by the [FTC] issued a report confirming Xceligent's mass infringement of CoStar's copyrighted images."). Regardless, those years-old allegations name no broker whose listing CoStar altered during the Class Period, let alone one who was thereby prevented from supplying information to a rival.

challenges: CoStar's copyright suits, the Leon Capital action, counsel's correspondence, and any attempts by CoStar to enforce its intellectual-property rights. Compl. ¶¶ 17, 121, 135, 172-82.

Plaintiffs try to evade immunity by labeling these suits a "sham." But where a plaintiff challenges a series of suits, the question is whether they were filed "without regard for the merits." *Navient Sols., LLC v. Lohman*, 136 F.4th 518, 523-24 (4th Cir. 2025). In *Navient*, the Fourth Circuit held sixty-one suits immune because they "centered on . . . a single and legitimate" legal core. *Id.* at 521-22. Plaintiffs' own allegations describe just such a core. Of the thirty-seven suits filed since 2015, most targeted CoStar's own customers for breaching the Customer Terms, Compl. ¶ 173—by, in Plaintiffs' words, "sharing passwords, failing to pay their bills, or even downloading and printing Listing Data," *id.*; *see id.* ¶ 174 (suits against brokers "who used other CoStar users' accounts to access the website and view property data"). The rest sought to protect CoStar's copyrighted images from infringement. *Id.* ¶ 176. Suing customers who do not pay and rivals who copy is not a sham. It is how a business protects decades of investment in its intellectual property and product offerings.

Nor can Plaintiffs plausibly characterize CoStar's successful enforcement litigation as a sham. *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2001) (a winning lawsuit is, by definition, a "reasonable effort at petitioning for redress and therefore not a sham"). Plaintiffs concede that CoStar's suits mostly ended in "settlements or consent judgments." Compl. ¶ 175; *Navient*, 136 F.4th at 523-24 (thirty-seven settlements totaling more than $1.5 million).

What the Complaint omits is more telling still. CoStar obtained a preliminary injunction in its litigation against LoopNet more than twenty years ago, *CoStar Grp., Inc. v. LoopNet, Inc.*, 164 F. Supp. 2d 688, 715-17 (D. Md. 2001); the *Xceligent* court entered a stipulated judgment for *$500 million* based on an FTC monitor's conclusion that Xceligent had improperly derived tens of

thousands of images from CoStar, *CoStar Grp., Inc. v. Xceligent, Inc.*, 2019 WL 6622862 (W.D. Mo. Dec. 3, 2019); CoStar's copyright claims against CREXi—which cover tens of thousands of allegedly infringing images—survived summary judgment and are proceeding to trial, with the district court citing "ample evidence" that CREXi copied LoopNet content at scale and directing personnel to crop CoStar watermarks, *CoStar*, 2025 WL 2647269, at *9-13; and a court permanently enjoined Leon Capital from accessing CoStar's database or exporting its records without authorization, *see* Judgment, *CoStar Grp., Inc. v. Leon Capital Grp., LLC*, No. 1:21-cv-02227-CRC, (D.D.C. Sept. 10, 2024), ECF No. 49. This Court may take judicial notice of those rulings. *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989). Lawsuits that produced injunctions and substantial judgments, and claims headed to trial, are not a sham.

### 3. The Non-Compete Provisions Are Ancillary To A Legitimate License

Plaintiffs also challenge provisions of the Terms barring customers from using CoStar's Licensed Product "to create, directly or indirectly, any database or product," or giving access to "competitor[s]." Compl. ¶¶ 128-29. These provisions do what every database license does: stop licensees from using the database to copy it. Such restraints are ancillary to a legitimate license and judged under the rule of reason, *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 (9th Cir. 2021), as are vertical restraints generally, *United States v. Brewbaker*, 87 F.4th 563, 571 (4th Cir. 2023). And protecting a database from being copied into a rival product is a legitimate purpose, not exclusionary conduct. *Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 817-18 (D. Md. 1995) (rejecting antitrust claims based on refusal to permit copying of copyrighted real estate database), *aff'd*, 91 F.3d 132 (4th Cir. 1996); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-98 (11th Cir. 2004) (preventing free riding supplied legitimate business justification for restrictions on redistribution of compiled information).

Nor do Plaintiffs plausibly allege harm to competition. They must identify "a competitor willing and able to enter the relevant market, but for the exclusionary conduct." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.,* 711 F.3d 1264, 1273 (11th Cir. 2013); *see Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008). They identify none. No named Plaintiff claims it wanted to build or back a rival database, and Plaintiffs concede that broker-led entry is something they only "could theoretically" pursue. Compl. ¶ 14. Their claim that the Terms "directly foreclosed competitive initiatives," *id.* ¶ 130, rests on two abandoned efforts from 2011 and 2021, *id.* ¶¶ 131-34—and no allegation that anyone involved invoked, or even knew of, the challenged provisions. (The only other example, a successful 2021 contract suit against a single customer, Leon Capital, describes no thwarted initiative. *Id.* ¶ 135; *see supra* 19.) And generalized "fears of retaliation," Compl. ¶ 134, are no substitute for facts showing that these provisions actually impeded competition. *See Dickson*, 309 F.3d at 212-13.

## II. PLAINTIFFS ALLEGE NO PLAUSIBLE MARKET OR MONOPOLY POWER

Even if Plaintiffs had plausibly alleged exclusionary conduct, their claims would independently fail for lack of market or monopoly power. Each count requires market power, and the Section 2 counts require monopoly power. *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014). Direct proof of market power requires both supracompetitive prices and restricted output. *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *4 (E.D. Va. Dec. 18, 2013); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021). Indirect proof requires a dominant market share, significant entry barriers, and rivals' inability to expand output. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434, 1439 (9th Cir. 1995). The Complaint plausibly alleges neither form of proof in either market.

### A. Listing Services (Counts 1, 3, 5, and 7)

***Supracompetitive prices.*** Plaintiffs' overcharge theory fails on its own terms because they plead that a cheaper substitute is readily available. The Complaint pleads that CREXi is cheaper and accessible, and it pleads no impediment to using it during the Class Period. Compl. ¶¶ 84, 215. (Tellingly, the named Plaintiffs do not and cannot allege they do *not* list on CREXi.) On those facts, the only plausible explanation for any LoopNet price premium is LoopNet's higher-quality product, which Plaintiffs themselves plead when they allege that it has an audience that is many times larger than its rivals'—*i.e.*, competition on the merits, not an overcharge. *Id.* ¶ 221. But charging more than a rival "may simply reflect a superior product." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005). Where an obvious lawful explanation exists, the inference of unlawful conduct is not plausible. *Twombly*, 550 U.S. at 567.

The specific price allegations do not change that conclusion. Most predate the Class Period: The LoopNet advertising-tier increase Plaintiffs cite occurred in 2020-2021, Compl. ¶ 255, and the comparisons to pre-2012 LoopNet pricing, *id.* ¶¶ 77, 215, concern acquisition-era events and different products. *E.g.*, *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998) (affirming dismissal "due to the lack of causal connection between the defendants' [allegedly anticompetitive] actions" and alleged overcharge). The only Class Period allegation—"annual price increases of 5 to 8%"—lumps LoopNet together with the CoStar Database, identifies no listing-specific increase, and pleads no facts showing the increases exceeded competitive levels rather than tracking costs, inflation, or product improvements. Compl. ¶¶ 214, 261. Raising prices does not show harm to competition. *E.g.*, *Brill Maritime*, 2026 WL 1730090, at *11. And courts consistently reject claims of supracompetitive pricing where, as here, the plaintiff "state[s] simply that [the defendant's] prices are high[]" without providing a competitive benchmark. *R.J.*

*Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 382 (M.D.N.C. 2002), *aff'd sub nom.* 67 F. App'x 810 (4th Cir. 2003).

***Restricted output.*** Independently, Plaintiffs do not plead restricted output. The Complaint alleges that, despite "price increases," listing volume on LoopNet steadily *increased*. Compl. ¶ 190. That is the opposite of restricted output. And the retirement of unlimited listing plans and the move to tiered pricing, *id.* ¶¶ 249, 255, are simply one firm's pricing decisions, not a market-wide restriction of output, and both predate the Class Period.

***Indirect evidence.*** The Complaint's ">90%" share figure, *id.* ¶ 220, rests on marketing puffery about "CRE activity" and visitor traffic, *id.* ¶ 221. But web traffic is not the same as a share of paid listing services. And Plaintiffs do not account for their own (accurate) allegations that brokers can list the same property on multiple platforms, *supra* 5-6, 11—so traffic on LoopNet says nothing about whether CoStar controls any share of listings to the exclusion of rivals. *Compass, Inc. v. Zillow, Inc.*, 2026 WL 321084, at *18 (S.D.N.Y. Feb. 6, 2026) (finding audience-share figures flawed as measures of market share where they failed to account for users visiting multiple platforms and included activity outside the relevant market). In any event, market share would not be enough; Plaintiffs also must plead entry barriers and an inability to expand. *E.g.*, *Kolon*, 748 F.3d at 174-75. Their assertion that CoStar has kept rivals from "achieving the scale necessary to expand," Compl. ¶ 210, is conclusory and refuted by their own allegations that CREXi entered at half the price and became CoStar's "chief competitor," *id.* ¶¶ 84, 196; *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (rejecting monopolization claim where easy entry and rival's rapid growth rebutted inference of monopoly power from share exceeding 70%).

**B. Information Services (Counts 2, 4, 6, and 8)**

***Supracompetitive prices.*** The information services price allegations fail for the same reason the listings allegations do: Plaintiffs plead that cheaper alternatives exist. *Supra* 21. And

every benchmark they offer compares apples to oranges—CoStar's comprehensive database against pre-2017 Xceligent, against CREXi, and against rivals' prices as CoStar's CEO described them during the 2008 recession. Compl. ¶¶ 215, 238, 251. A higher price "may simply reflect a superior product." *Harrison Aire*, 423 F.3d at 381. Plaintiffs say as much: CoStar's analytics, market reports, and comps are ones subscribers "cannot easily" replicate. Compl. ¶¶ 185, 191, 222. And Plaintiffs acknowledge that the 2021 single global subscription was a broader product at a higher price. *Id.* ¶ 258. Nor do renewal rates of 90% or more among long-tenured customers signal monopoly power. *Id.* ¶¶ 217, 264. They signal a product customers value—and preference is not power. *Jefferson Parish*, 466 U.S. at 26 (declining to infer significant market power from consumers' preference for particular hospital).

***Restricted output.*** The Complaint's references to "lowered output" are boilerplate and not backed by facts. Compl. ¶¶ 300, 320; *see Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010) (rejecting reduced-output allegations that "provide[] no direct evidence . . . beyond stating that these conditions exist"); *Gamboa v. Apple Inc.*, 808 F. Supp. 3d 951, 968-69 (N.D. Cal. 2025) (declining to infer market-wide restricted output from conclusory allegations that competitors would produce more absent the challenged conduct). And its specific allegations—the retirement of three LoopNet information products in 2017-2018 and the July 2021 move to a global subscription, Compl. ¶¶ 246-47, 257-58—describe one firm's product decisions, not a market-wide reduction in output, and both predate the Class Period.

***Indirect evidence.*** The market-share allegations suffer from the same traffic-versus-share defect described above. *Supra* 22. And the ordinary industry costs of collecting data, Compl. ¶ 204, are not entry barriers, *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 (9th Cir. 1993). Nor does the Complaint say anything concrete about rivals' capacity to expand in the information

services market. *Rebel Oil*, 51 F.3d at 1434, 1439. What it does allege points the other way: Plaintiffs hold up CREXi as a lower-priced information services alternative, Compl. ¶¶ 84, 215, yet plead no facts suggesting that CREXi—or any other rival—could not serve more customers.

## III. PLAINTIFFS ALLEGE NO PLAUSIBLE ANTITRUST INJURY

Nor does the Complaint plead antitrust injury. A plaintiff may recover only for loss that "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). And antitrust injury "must be pled with specificity," not merely asserted. *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 950 (W.D.N.C. 2000); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983).

Plaintiffs' theory of injury rests on two links: that CoStar's alleged "scheme" foreclosed rivals, and that the resulting loss of competition let CoStar charge them supracompetitive prices during the Class Period. Compl. ¶¶ 270-71. Neither link holds. The Complaint identifies no rival foreclosed during the Class Period. *Supra* 12-15. And it offers no facts showing that CoStar's prices exceeded competitive levels rather than reflecting a more valuable product. *Supra* 21-23.

More fundamentally, no named Plaintiff pleads facts showing an overcharge. Each repeats, word for word, that it "paid supracompetitive fees directly to Defendants." Compl. ¶¶ 23-27. That is a label, not a fact. No Plaintiff says what product or tier it bought, when or what it paid, whether its price ever rose, or why it paid more because competition was suppressed. None claims it tried to switch to CREXi or another cheaper rival and could not. That is not enough. *E.g.*, *Scaturo v. Fanatics, Inc.*, 2026 WL 810372, at *8 (S.D.N.Y. Mar. 23, 2026); *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 831-32 (N.D. Cal. 2015) (dismissing where plaintiffs failed to identify the amounts they paid or facts showing those payments reflected an overcharge).

Plaintiffs' remaining allegations do not fill the gap. CoStar's 2021 decision to discontinue local, regional, and statewide subscriptions, Compl. ¶¶ 257-59, injured no Plaintiff: None alleges that it bought—or would have bought—a narrower subscription, much less that the change resulted from excluding rivals. And the change predates the Class Period. Xceligent's 2017 bankruptcy, *id.* ¶¶ 82, 252, is no better: Plaintiffs offer no facts connecting the intervening decisions of Xceligent and its owner—made more than four years before the Class Period—to any overcharge a named Plaintiff paid years later. And though Plaintiffs call CoStar's supposed degradation of data by fingerprinting "a classic form of antitrust injury," *id.* ¶ 154; *see id.* ¶ 245, no Plaintiff alleges that it encountered inaccurate data, relied on it, or was harmed by it.

## IV. PLAINTIFFS' CLAIMS ARE TIME-BARRED

Finally, the claims are barred by the Sherman Act's four-year limitations period. 15 U.S.C. § 15b; *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (4th Cir. 2024).

Every purportedly exclusionary act Plaintiffs challenge began well before April 14, 2022. By their own account, CoStar "imposed" the Customer Terms "as early as 2017," Compl. ¶ 245; allegedly began watermarking customer photographs in 2017, *id.* ¶ 139; and sued Leon Capital in 2021, *id.* ¶ 135. Plaintiffs insist the "scheme" "continues to the present," but they identify no anticompetitive conduct within the Class Period. The Customer Terms, they concede, "have remained substantively the same." *Id.* ¶ 11 n.1. Renewing unchanged contracts and collecting prices under them are textbook reaffirmations—not new overt acts that restart the clock. *See CSX*, 114 F.4th at 290-91; *Lancianese v. Bank of Mount Hope*, 783 F.2d 467, 470 (4th Cir. 1986). Plaintiffs' claims are time-barred.

## CONCLUSION

CoStar respectfully requests that the Complaint be dismissed with prejudice.

Dated: November 17, 2026

Respectfully submitted,

*/s/ M. F. Connell Mullins, Jr.*

Hugh M. Fain, III (VSB No. 26494)
M. F. Connell Mullins, Jr. (VSB No. 47213)
Edward Everett Bagnell, Jr. (VSB No. 74647)
SPOTTS FAIN, PC
411 E. Franklin Street
Suite 600
Richmond, VA 23219
Tel: 804.697.2000
Fax: 804.697.2100
hfain@spottsfain.com
cmullins@spottsfain.com
ebagnell@spottsfain.com

David L. Johnson (VSB No. 89289)
Nicholas J. Boyle (*pro hac vice*)
Sarah A. Tomkowiak (*pro hac vice*)
Anne C. Malinee (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
david.johnson@lw.com
nicholas.boyle@lw.com
sarah.tomkowiak@lw.com
anne.malinee@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel: 212.906.1200
Fax: 212.751.4864
lawrence.buterman@lw.com

Katherine L. Griffitts (*pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: 312.876.7700
Fax: 312.993.9767
katherine.griffitts@lw.com

Elyse M. Greenwald (*pro hac vice*)
LATHAM & WATKINS LLP
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067
Tel: 424.653.5500
Fax: 424.653.5501
elyse.greenwald@lw.com

*Attorneys for Defendants CoStar Group, Inc. and CoStar Realty Information, Inc.*