# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| IN RE COSTAR GROUP, INC., ET AL., ANTITRUST LITIGATION | MDL No. 3192<br><br>Case No. 3:26-md-3192 (DJN) |

**BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................... ii

INTEREST OF *AMICUS CURIAE* ..................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 2

ARGUMENT ..................... 3

I. *Twombly*'s Plausibility Standard Applies to All Antitrust Cases. ..................... 3

II. *Twombly* Applies to All Elements of Antitrust Claims. ..................... 7

III. Loosening *Twombly*'s Pleading Standard Would Impose Enormous Costs, Coerce Settlements, and Chill Procompetitive Business Arrangements. ..................... 11

CONCLUSION ..................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
2 F.4th 695 (7th Cir. 2021) ....10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....1, 4, 5, 7

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ....10

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....1–5, 7–14

*Conley v. Gibson*,
355 U.S. 41 (1957)....4

*DataCell ehf. v. Visa, Inc.*,
2015 WL 4624714 (E.D. Va. July 30, 2015) ....8

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ....7

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) ....11

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ....6

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ....6

*FTC v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021)....10

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ....10

*Global Tel*Link Corp. v. JACS Sols., Inc.*,
708 F. Supp. 3d 784 (E.D. Va. 2023) ....9

*Goldfinch Lab'y., P.C. v. Iowa Pathology Assocs., P.C.*,
168 F.4th 500 (8th Cir. 2026) ....................................................................................11

*In re Google Digit. Advertis. Antitrust Litig.*,
627 F. Supp. 3d 346 (S.D.N.Y. 2022)........................................................................8

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ....................................................................................10

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006).......................................................................................................5

*In re Jan. 2021 Short Squeeze Trading Litig.*,
105 F.4th 1346 (11th Cir. 2024) ..................................................................................10

*Kleen Prods. LLC v. Int'l Paper Co.*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ..........................................................................12

*Lazarou v. Am. Bd. of Psychiatry & Neurology*,
158 F.4th 854 (7th Cir. 2025) ....................................................................................11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007).......................................................................................................7

*Loren Data Corp. v. GXS, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ...............................................................................11

*Nat'l ATM Council, Inc. v. Visa Inc.*,
2023 WL 4743013 (D.C. Cir. July 25, 2023) ......................................................12, 13

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)................................................................................................7, 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)................................................................................................5, 6

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
199 F. Supp. 2d 362 (M.D.N.C. 2002) ..........................................................................9

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995) ......................................................................................13

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ......................................................................................11

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911)...........................................................................................................8

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) .......... 8

*Tampa Elec. Co. v. Nashville Coal Co.*,
365 U.S. 320 (1961) .......... 9

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......... 5, 6, 13, 14

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .......... 5, 9

**Statutes**

15 U.S.C. § 1 .......... 3

15 U.S.C. § 2 .......... 3

15 U.S.C. § 15 .......... 12

**Rules**

Fed. R. Civ. P. 8 .......... 3, 4, 11

**Other Authorities**

2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2025) .......... 6, 9, 12

Edward D. Cavanagh, *The Private Antitrust Remedy: Lessons from the American Experience*,
41 Loy. U. Chi. L.J. 629 (2010) .......... 12

David F. Herr, *Annotated Manual for Complex Litigation*
(4th ed., updated May 2022) .......... 12

Paul H. Saint-Antoine et al., *Private Antitrust Litigation in the United States: Overview* (2019) .......... 12

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber and its members have a strong interest in this case. The Chamber's members frequently are named as defendants in civil suits, including antitrust suits. They have an interest in ensuring that courts across the country adhere to the plausibility standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Twombly* protects businesses by ensuring that they will not face costly discovery unless plaintiffs can plead facts plausibly demonstrating their entitlement to relief. The plausibility standard also protects our court system by preventing its resources from being overwhelmed by frivolous litigation. Adherence to *Twombly* is particularly important in antitrust cases like this one, in which denial of a motion to dismiss based on threadbare allegations could open the door to extraordinarily broad and burdensome discovery.

---

[1] Defendants consent to the filing of this brief and Plaintiffs stated that they take no position. *Amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court's decision in *Twombly* requires that antitrust plaintiffs plead facts plausibly showing an antitrust violation before a court imposes the extraordinary burdens of antitrust discovery and the threat of treble damages. Allegations that are merely consistent with antitrust liability, or that amount to little more than labels and conclusions, are insufficient to survive a motion to dismiss.

Rigorous application of *Twombly* is particularly important where the challenged conduct includes ordinary commercial agreements and business conduct. Businesses across the economy routinely enter into agreements governing their day-to-day operations, including those regarding intellectual-property rights, licensing arrangements, data access, platform usage, and the terms on which customers may use commercial products and services. Except for the narrow class of agreements that are *per se* unlawful, the antitrust laws do not prohibit the mere existence of such agreements. Instead, the antitrust laws require a plaintiff plausibly to allege that the challenged agreement unreasonably restrains competition. Although *Twombly* itself concerned whether allegations of parallel conduct were sufficient to allege an agreement, its plausibility standard applies with equal force to allegations that an agreement (or other alleged conduct) is anticompetitive. Treating the existence of an agreement as sufficient by itself would confine *Twombly*'s plausibility standard to the narrow class of cases where an agreement's existence is genuinely contested, while leaving the vast set of antitrust cases open to the kind of speculative, conclusory pleading that *Twombly* was designed to weed out.

The Court should apply *Twombly* with full force and in recognition of the important role it serves in antitrust cases. *First*, *Twombly*'s plausibility requirement applies to all antitrust claims, including those alleging that the defendant has engaged in unlawful monopolization in violation

of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Second*, the plausibility standard established by *Twombly* applies to all elements of an antitrust claim, including, as appropriate, relevant market, monopoly power, and harm to competition. *Third*, the immense costs of antitrust discovery and the threat of treble damages create powerful pressure on defendants to settle even meritless claims. Weakening *Twombly*'s pleading standard would only magnify that pressure and invite future plaintiffs to transform routine commercial agreements into antitrust lawsuits, imposing substantial costs on businesses and courts alike. The Court should thus ensure that *Twombly*'s plausibility standard is met before permitting further litigation to proceed.[2]

## ARGUMENT

### I. *Twombly*'s Plausibility Standard Applies to All Antitrust Cases.

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "unreasonable restraints of trade" that are "effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553. And Section 2 makes it unlawful to "monopolize, or attempt to monopolize … any part of the trade or commerce among the several States." 15 U.S.C. § 2. In *Twombly*, the Supreme Court confronted the "question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." *Twombly*, 550 U.S. at 554–55. Although *Twombly* arose in the context of a Section 1 claim, its standard is not tied to any particular antitrust claim, and it governs every claim under the Sherman Act, whether brought under Section 1 or Section 2.

In *Twombly*, the Supreme Court explained that, under Rule 8, an antitrust plaintiff must plead "more than labels and conclusions" and that "a formulaic recitation of the elements of a

[2] The Chamber does not express a view on whether the *Twombly* standard has been met here or how *Twombly* applies to the facts of this case. Rather, the purpose of this brief is to underscore the importance of rigorously applying the *Twombly* standard in antitrust cases, including this matter, given the consequences to the business community of failing to do so.

cause of action will not do." 550 U.S. at 555. The Court observed that, under the prior formulation governing motions to dismiss, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 561–63 (cleaned up) (discussing *Conley v. Gibson*, 355 U.S. 41 (1957)). The *Twombly* Court rejected that standard and held instead that "[f]actual allegations must be enough to raise a right to relief above the speculative level" to survive dismissal. *Id.* at 555. "[A]pplying these general standards to a § 1 claim," the Court held that "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. As a result, it was insufficient to allege that the defendants had engaged in "parallel conduct" with only a "bare assertion of conspiracy." *Id.* Parallel conduct alone, "[w]ithout more," "does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556–57.

The complaint in *Twombly* failed because the plaintiffs failed to sufficiently allege a plausible conspiracy, but *Twombly*'s reasoning is not confined to its specific facts. The Court held that the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has since confirmed that this reasoning is not limited to Section 1 claims or even to antitrust claims but, rather, applies to "all civil actions." *Iqbal*, 556 U.S. at 684 (citation omitted).

*Twombly* thus applies with equal rigor in cases involving allegations that a defendant engaged in monopolization in violation of Section 2 of the Sherman Act. It is especially important

for courts to apply *Twombly* and *Iqbal* to Section 2 claims because those claims often involve unilateral conduct and commercial agreements that are legitimate and procompetitive when undertaken by firms without monopoly power. For example, certain agreements like exclusive dealing and tying arrangements generally raise antitrust concerns only when effectuated by a firm with monopoly or market power. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) (exclusive dealing); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) (tying). Further, it is not unlawful to be a monopolist or even to charge monopoly prices. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The Supreme Court has cautioned that the possession of monopoly power must be "accompanied by an element of anticompetitive *conduct*," and that "[m]istaken inferences and the resulting false condemnations are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* at 407, 414 (citation omitted).

Consistent with that caution, the Court has directed dismissal at the pleading stage where a Section 2 claim rests on a theory of exclusionary conduct that the antitrust laws do not recognize. *See id.* at 410–11 (reversing judgment that refusal-to-deal allegations stated a claim); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 449–52 (2009) (holding that price-squeeze claim failed at pleading stage). Just as allegations of parallel conduct may be "merely consistent with"—and therefore insufficient to state—a conspiracy claim under Section 1, *Twombly*, 550 U.S. at 557, allegations that a firm with a large market share entered into certain contracts or competed vigorously may be consistent with lawful competition on the merits.

Finally, application of *Twombly* is important in Section 2 cases where a plaintiff alleges a combination of agreements and conduct that are generally acceptable business practices but that taken together purportedly enable a defendant to maintain a monopoly. In such cases, courts must

ensure that plaintiffs cannot circumvent a motion to dismiss by referencing ordinary commercial conduct simply because the plaintiff also alleges that the defendant is a monopolist. *See Trinko*, 540 U.S. at 414 ("The cost of false positives counsels against an undue expansion of § 2 liability."). Although the Supreme Court has not squarely addressed whether a monopolist's individual lawful acts may be aggregated into a single Section 2 violation, it has refused to combine deficient theories into a new form of Section 2 liability, explaining that "[t]wo wrong claims do not make one that is right." *linkLine*, 555 U.S. at 457. In *linkLine,* for example, the Court rejected a price-squeeze claim that was "nothing more than an amalgamation" of two meritless claims where each component was "independently lawful." *Id.* at 452, 455; *see also* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 310c7 (2025) ("Areeda & Hovenkamp") (cautioning that, in assessing whether "two or more practices, while lawful individually, can be aggregated into a series or pattern capable of sustaining a Sherman Act § 2 offense," "care must be taken lest … illegality be inferred from procompetitive conduct").

The Fourth Circuit has held that courts evaluating an alleged exclusionary campaign can consider together genuinely interconnected acts, but it cautioned that courts should "take care not to aggregate acts that are procompetitive to produce only a semblance of an exclusionary effect when considered together." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 356 (4th Cir. 2024). That holistic principle does not relieve a plaintiff of its threshold obligation to plausibly allege facts showing how the challenged acts are connected and how their combined effect is exclusionary. *See In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (noting that "[f]or the sake of accuracy, precision, and analytical clarity," courts

must evaluate alleged exclusionary conduct separately and "[o]nly then" consider whether "any synergistic effect" supports liability).

## II. *Twombly* Applies to All Elements of Antitrust Claims.

Just as *Twombly* is not limited to one type of antitrust claim, it also is not limited to a particular element of an antitrust claim. Rather, a plaintiff must plausibly plead facts supporting *each* element of its claim in order to proceed to discovery. Each element is a necessary part of "the grounds of [the plaintiff's] entitlement to relief," and each must be supported by facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). *Twombly* happened to concern the agreement element of a Section 1 claim. But nothing in the Court's reasoning suggests that a plaintiff who adequately pleads an agreement may then rely on labels and conclusions for everything else.

The principle that *Twombly* applies to elements beyond the existence of an agreement is especially important in cases decided under the rule of reason, which governs most antitrust claims. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007). Under the rule of reason, a plaintiff must show not only the existence of an agreement, but also that the agreement "impose[s] an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). In other words, the agreement must produce substantial anticompetitive effects that outweigh the agreement's procompetitive benefits. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018). Under *Twombly* and *Iqbal*, a plaintiff must plausibly allege both the existence of an agreement and that the agreement harms competition in a relevant market. A plaintiff cannot rely on conclusory assertions that the alleged conduct harms competition. Instead, the plaintiff must allege facts that demonstrate *how* the challenged agreement harms competition—for example, by foreclosing rivals, raising prices, reducing output, or diminishing quality. *See Dickson*, 309 F.3d at 206–07. And the plaintiff must allege "facts that plausibly describe harm to

competition." *In re Google Digit. Advertis. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022).

Unlike *per se* antitrust offenses, such as horizontal price fixing or market allocation agreements, the dispute in rule-of-reason cases often is not about whether the agreement exists but, rather, whether the agreement harmed competition. *See Am. Express*, 585 U.S. at 540–41. As the Supreme Court has long recognized, "[a]lthough the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' … Congress intended to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). Whether a restraint is reasonable depends on its context, including the market in which it operates, the defendant's position in that market, and the restraint's actual or likely effects. *See id.*; *see also DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714, at *8–9 (E.D. Va. July 30, 2015) (dismissing Section 1 claim where plaintiffs could not plausibly allege that the restraint of trade was unreasonable).

*Twombly*'s reasoning applies just as strongly in deciding whether the plaintiff has adequately alleged an anticompetitive *agreement* (*i.e.*, more than just parallel conduct) as in deciding whether the plaintiff has alleged an unreasonable *anticompetitive* agreement (*i.e.*, an agreement that harms competition). Rigorous enforcement of *Twombly*'s plausibility standard is needed to avoid excessive antitrust litigation even when an agreement is pleaded adequately for the simple reason that, in many cases, it is trivially easy to do so. Businesses enter into innumerable agreements. They form joint ventures. They offer licenses to competitors, subcontractors, and customers. They negotiate contracts with other businesses up and down the supply chain. All of these arrangements involve "agreements." But the vast majority of agreements are not anticompetitive. To the contrary, most agreements are procompetitive, as a functioning economy requires enforceable contracts. *Cf. Standard Oil Co. v. United States*, 221

U.S. 1, 63 (1911) (rejecting limitless reading of the Sherman Act that would prohibit "every contract, act, or combination of any kind or nature" and thus "would be destructive of all right to contract … in any respect whatever"). If plaintiffs could survive a motion to dismiss merely by pleading (1) that an agreement exists, and (2) general, speculative allegations that the agreement is anticompetitive, there would be no end to antitrust litigation.

Exclusive-dealing claims illustrate the importance of rigorous application of *Twombly*. Exclusive-dealing arrangements "are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270. In fact, they often benefit competition, as they can assure supply, reduce transaction costs, encourage investment in the relationship, and prevent free riding. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 334–35 (1961); Areeda & Hovenkamp ¶ 1800. Because of those benefits, an exclusive-dealing arrangement violates the antitrust laws only in the limited circumstances where the defendant possesses market power and the arrangement forecloses competition in a substantial share of the relevant market. *See R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 380–81, 387 (M.D.N.C. 2002); *see also Global Tel*Link Corp. v. JACS Sols., Inc.*, 708 F. Supp. 3d 784, 797–98 (E.D. Va. 2023).

*Twombly* requires a plaintiff to plead facts plausibly supporting each of those requirements. It is not enough to allege that a company entered into a commercial agreement containing an exclusivity provision. Millions of lawful contracts would satisfy that description. The plaintiff must also allege facts, not conclusions, plausibly showing that the defendant has market power in a properly defined market, and that the agreement forecloses competition in a substantial share of that market. Without those allegations, the complaint describes only an ordinary commercial agreement, which is "merely consistent with" an antitrust violation. *Twombly*, 550 U.S. at 557.

Courts frequently have applied *Twombly* and affirmed dismissal in cases where the existence of an agreement is undisputed or assumed but plaintiffs fail to plausibly allege anticompetitive effects. For example, the Eleventh Circuit affirmed dismissal of a claim that the defendant brokerages conspired to restrict trading because there were no plausible allegations of "the unreasonable restraint of trade element," which was "dispositive of" plaintiffs' claim. *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1354 (11th Cir. 2024). In another case, the Ninth Circuit rejected claims related to licensing agreements between hotels and a software vendor to use price-recommendation software because plaintiffs failed to allege that the agreements actually restrained trade in the relevant market. *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1081 (9th Cir. 2025); *see also Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) ("There is no question that plaintiffs alleged a contract … However, plaintiffs have not carried their burden to show a resultant unreasonable restraint of trade in [a] relevant market." (quotation omitted)).

For monopolization cases brought under Section 2 of the Sherman Act, *Twombly*'s plausibility standard squarely applies to the threshold requirement that the defendant has monopoly power in a relevant market. A plaintiff cannot simply assert that a defendant dominates a market of the plaintiff's own choosing; it must plead facts that "plausibly allege a relevant market." *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 189 (10th Cir. 2025). When the alleged market is implausibly narrow, or the complaint offers only conclusory assertions of dominance, the claim fails at the threshold. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–23 (9th Cir. 2018) (affirming dismissal of Section 2 claim for failure to plead a plausible relevant market); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 17–20 (D.D.C. 2021)

(dismissing Section 2 complaint where allegations of market share were too conclusory to plausibly allege monopoly power).

A Section 2 plaintiff also must plead facts plausibly showing exclusionary conduct—plaintiffs must "plausibly show that the defendants' actions have affected competition or that the defendants are close to monopolizing anything." *Goldfinch Lab'y., P.C. v. Iowa Pathology Assocs., P.C.*, 168 F.4th 500, 506 (8th Cir. 2026) (citation omitted). Courts have affirmed dismissal where the conduct alleged reflects ordinary business judgment rather than exclusion, or where the complaint does not plausibly allege anticompetitive effects. *See, e.g.*, *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 281–82 (4th Cir. 2012) (affirming dismissal of Section 2 claims where the alleged exclusionary conduct "reflect[ed] [defendant's] unilateral business judgment"); *Lazarou v. Am. Bd. of Psychiatry & Neurology*, 158 F.4th 854, 858 (7th Cir. 2025) (affirming dismissal of monopolization and tying claims where complaint failed plausibly to allege anticompetitive effects); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022) (affirming dismissal of Section 2 claim where complaint did not plead anticompetitive conduct in the relevant market).

## III. Loosening *Twombly*'s Pleading Standard Would Impose Enormous Costs, Coerce Settlements, and Chill Procompetitive Business Arrangements.

Rule 8 serves a gatekeeping function to protect against meritless cases proceeding to discovery. In *Twombly*, the Supreme Court recognized that this function is particularly important in antitrust cases given the "unusually high cost of discovery." 550 U.S. at 558 (quotation omitted). As Judge Wilkinson observed: "It is no accident that *Twombly* itself was an antitrust decision. For what we confront in antitrust law is a perfect storm of treble damages, large discovery costs, and relaxed pleading standards." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 444 (4th Cir. 2015) (Wilkinson, J., concurring in part and dissenting in part). Allowing speculative claims

against businesses to proceed to expensive discovery—along with the threat of treble damages—would chill legitimate and procompetitive business conduct. District courts must therefore retain the power "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quotation omitted).

*First,* antitrust discovery remains extraordinarily expensive. "A defendant involved in complex antitrust litigation can expect attorneys' fees and costs to often exceed [one] million [dollars] per year, with such fees and costs increasing substantially if the case proceeds past an early motion to dismiss and into fact discovery." Paul H. Saint-Antoine, et al., *Private Antitrust Litigation in the United States: Overview* (2019). Antitrust litigation "involve[s] voluminous documentary and testimonial evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and attorneys, and substantial sums of money." David F. Herr, *Annotated Manual for Complex Litigation* § 30 (4th ed., updated May 2022); *see also, e.g.*, *Kleen Prods. LLC v. Int'l Paper Co.*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017) ("After six years of extensive discovery, more than a hundred depositions, and millions of documents produced in discovery, the statements that Plaintiffs were able to gather simply are not incriminating."), *aff'd*, 910 F.3d 927 (7th Cir. 2018). "[D]iscovery and the pre-trial process are extremely burdensome to defendants and become more burdensome as the universe of discoverable subject matter is broader, a phenomenon that is exacerbated by overly ambiguous pleadings." Areeda & Hovenkamp § 307d.

*Second*, because the federal antitrust laws authorize treble damages for private plaintiffs, defendants often feel pressured to settle because the consequences of liability can be "economically devastating." Edward D. Cavanagh, *The Private Antitrust Remedy: Lessons from the American Experience*, 41 Loy. U. Chi. L.J. 629, 633–34 (2010); *see also* 15 U.S.C. § 15(a);

*Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013, at *5 (D.C. Cir. July 25, 2023) (noting treble damages "would exceed [defendants'] net income" and push them "inexorably toward settlement" (quotation omitted)). When that level of potential exposure is combined with class-wide claims, the possible damages can reach a level that no rational business will risk at trial, however weak the claim. The Supreme Court has recognized that, faced with even a small chance of a devastating loss, defendants "will be pressured into settling questionable claims." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). Courts have described the resulting settlements as "blackmail settlements," which are driven by the magnitude of the exposure rather than the merits of the claim. *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (Posner, C.J.) (citation omitted). That dynamic is especially acute in class actions and consolidated proceedings, where the claims from many plaintiffs are aggregated and the stakes multiply accordingly. If complaints can survive dismissal with only conclusory allegations of harm, plaintiffs can extract settlements based on the treble-damages exposure, not the strengths of their claims. This result is a transfer of wealth from businesses and their customers to plaintiffs with meritless claims, which is precisely what *Twombly* was designed to prevent.

*Third*, a relaxed pleading standard would chill the very conduct the antitrust laws are designed to encourage. *See Trinko*, 540 U.S. at 414. If a complaint can survive dismissal by pleading the existence of ordinary commercial agreements together with conclusory allegations of harm, every license, exclusivity provision, or platform agreement would become a potential multi-year treble-damages case. Businesses would then face a choice between forgoing procompetitive conduct and accepting the risk of treble-damages litigation, and courts would be flooded with cases that ultimately fail on the merits. Consumers ultimately would bear the cost through less

investment, less innovation, and fewer of the very arrangements that drive competition. Rigorous application of *Twombly* is how courts avoid that result.

* * *

Plaintiffs bear the burden of showing that their allegations of an unreasonable restraint of trade satisfy *Twombly*'s plausibility requirement. A plaintiff cannot satisfy that obligation merely by alleging the existence of a contract or labeling the alleged conduct exclusionary. To proceed to discovery, *Twombly* requires a plaintiff to plead facts plausibly connecting the challenged conduct to harm to competition. Specifically, a complaint must contain allegations showing *how* the challenged conduct harms the competitive process, such as by foreclosing rivals from a substantial share of the relevant market, raising prices, reducing output, or diminishing quality for consumers. Where the conduct at issue is equally consistent with ordinary competition on the merits, the complaint must plead facts that tip the balance from the merely possible to the plausible. *See Twombly*, 550 U.S. at 557; *Trinko*, 540 U.S. at 414.

## CONCLUSION

This Court should apply *Twombly*'s plausibility standard rigorously when analyzing Plaintiffs' Complaint and considering Defendants' Motion to Dismiss.

November 24, 2026

Respectfully submitted,

*/s/ Kendall T. Burchard*

Kendall T. Burchard (VSB No. 95710)
Lauren Willard Zehmer (*pro hac vice* forthcoming)
Sameer Aggarwal (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
850 10th Street NW
Washington, DC 20001
(202) 662-6000
kburchard@cov.com

*Counsel for Amicus Curiae*
*Chamber of Commerce of the*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 24, 2026, I caused the foregoing document to be filed with the Clerk of the Court of the United States District Court for the Eastern District of Virginia using the Court's CM/ECF system.

*/s/ Kendall T. Burchard*
Kendall T. Burchard

*Counsel for Amicus Curiae*
*Chamber of Commerce of the*
*United States of America*